**Affirmed and Opinion filed October 25, 2011.**



In The

# Fourteenth Court of Appeals
_____

### NO. 14-10-00349-CV
_____

**CITY OF HOUSTON, TEXAS AND HARRIS COUNTY-HOUSTON SPORTS AUTHORITY, Appellants**

**V.**

**HOTELS.COM, L.P., HOTWIRE, INC., EXPEDIA, INC., TRAVELNOW.COM, INC., TRIP NETWORK INC. D/B/A CHEAPTICKETS.COM, ORBITZ, LLC, INTERNETWORK PUBLISHING CORP. D/B/A LODGING.COM, PRICELINE.COM INC., LOWESTFARE.COM INC., TRAVELWEB LLC, AND TRAVELOCITY.COM LP, Appellees**

**On Appeal from the 270th District Court
Harris County, Texas
Trial Court Cause No. 2007-13227**

# OPINION

This is one of many similar suits across the country in which local taxing authorities have sued online travel companies to recover allegedly unpaid hotel occupancy taxes.

Although the claims are similar, the outcome of each case depends on the evidence introduced and the language of the taxing provision at issue. Both the City of Houston and the Harris County-Houston Sports Authority tax "the cost of occupancy," which they contend is the amount paid by the consumer to the online travel company. The defendant companies maintain that these provisions tax the amount paid to the hotel. The trial court agreed with the online travel companies and granted summary judgment in the defendants' favor. The taxing entities appealed the judgment. This court must resolve any ambiguity in a tax statute in favor of the taxpayer. We conclude that, at a minimum, the provisions at issue reasonably can be construed to tax only the amounts paid to hotels. We therefore affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The City of Houston passed an ordinance imposing a tax of 7% on the "cost of occupancy" in a hotel; the Sports Authority passed a resolution applying an additional 2% tax on the "cost of occupancy." For many years, hotels remitted local hotel occupancy taxes, and the City and the Sports Authority (which we refer to collectively as "Houston") sought no additional funds from online travel companies ("OTCs"). In 2007, however, Houston sued the defendants to recover allegedly unpaid hotel occupancy taxes. The disposition of the case turns on the identification of the "cost of occupancy" for the purposes of the ordinance and the resolution.

To place these claims in context, it first must be understood that a hotel may offer the same room to the public at a variety of different rates. A consumer traveling to another area could research all of the hotels in that area to identify the different rates, amenities, and locations available, and after evaluating this information, reserve a room directly through the chosen hotel. Alternatively, a consumer could make a reservation through an intermediary such as a travel agency or an online travel company that already has the information available. This suit concerns transactions in which consumers made hotel

2

reservations through an online travel company that structures such transactions under the "merchant model." We therefore begin by explaining how that model operates, as shown from the summary-judgment evidence viewed under the applicable standard of review.[1] For clarity, we discuss the facts as though all of the defendants were OTCs using the merchant model exclusively, and that the ordinance and the resolution impose the only taxes that arguably might apply.[2]

## A. Merchant Model Reservations

Under the merchant model, a hotel and an OTC enter a contract in which they agree that the OTC will include information about the hotel on the OTC's website and allow consumers to reserve rooms through the site. The OTC does not purchase the right to use the room and then resell that right to a consumer, and does not promise that any reservations will be made. The hotel provides information about its facilities to the OTC and agrees that it will invoice the OTC for the room and for local hotel occupancy taxes. In the invoice, the hotel bills the OTC for the room at a discounted rate, and for local hotel occupancy taxes applicable to that amount. The contract between the hotel and the OTC is flexible in that the hotel has discretion to change the discounted rate it charges the OTC and the number of reservations it will allow the OTC to book. These figures can change hourly. The OTC adds a "markup" to the discounted rate to arrive at the online rate displayed to visitors to the OTC's website. In at least some instances, an OTC agrees with the hotel that the total amount it collects from a consumer will not be less than the amount that the hotel would have collected from the consumer if the consumer had booked the room through the hotel's website.

---

[1] We describe the standard of review in section II, *infra.* We emphasize that our description of the facts is drawn from the evidence in this case, and not from the inferences or conclusions drawn by other courts relying on a different record.

[2] This is not the exclusive business model used by all of the appellees, but it is the only one at issue. In addition, the appellees inform us that Lowestfare.com is not an online travel company, but we treat this as a distinction without a difference, as the parties themselves have done.

A typical online transaction under the merchant model proceeds as follows:

A consumer wishing to reserve a hotel room visits the OTC's website and responds to prompts for information such as identification of the city in which a room is wanted and the dates to be reserved. The consumer also may specify acceptable ranges for the room rate, the hotel's rating, and the distance between the hotel and some other location. The OTC applies an algorithm to the information to produce search results that are displayed to the consumer. In these results, the OTC lists area hotels with available rooms in the desired price range and information allowing the consumer to compare photographs, available amenities, distance from other locations, and ratings. If the consumer decides to make a reservation through the OTC, he clicks the appropriate button or link and is asked to provide a credit card to be charged. After the consumer enters this information, he is asked to review and confirm the reservation.

The next step is not visible to the consumer. Because the hotel is not obliged to accept any particular number of reservations from the OTC, and the OTC has neither the right nor the obligation to make a particular number of reservations with a given hotel, the OTC at some point must determine that the requested reservation will actually be accepted. Thus, while the consumer is reviewing the reservation, the OTC confirms availability with the hotel. In some instances, the OTC transmits the reservation information to an "extranet" accessible to both the OTC and the hotel; in other instances, the hotel can communicate directly with the OTC's computer system on a real-time basis to change the number of reservations available and the discounted rate it will charge the OTC. If the room is available, a confirmation number is sent to the OTC. When the consumer clicks a button or link on the website confirming the reservation, the OTC provides the confirmation number to the consumer and charges his credit card.

The amount the OTC charges the consumer consists of a marked-up rate and another charge that is commonly shown on the consumer's receipt as "taxes and fees." Internally, OTCs often refer to a "tax recovery charge" rather than to "taxes," but the two

4

amounts are intended to be identical. On some OTC websites, an icon is displayed offering more information about "taxes and fees," which is linked to an explanation that the word "taxes" refers to a "tax recovery charge." No payment for the reservation is transmitted to the hotel until the hotel sends an invoice to the OTC, which may occur when the room occupant checks in or checks out of the hotel. The hotel then invoices the OTC for the discounted rate for the room, and for an amount equal to the applicable local hotel occupancy taxes on the discounted rate. The City's hotel occupancy tax rate is 7%, and the Sports Authority's tax rate is 2%. So, for example, the websites of both the OTC and a local hotel might display a room rate of $200.00, even though the hotel might invoice the OTC for a discounted rate of only $175.00. If the consumer booked the room through the hotel's website, the hotel would charge the consumer $218.00, which represents the room rate of $200.00 and $18.00 for the taxes on that amount. If the consumer made the same reservation through the OTC's website, the OTC also would collect $218.00. Of that sum, $200.00 would be represented to the consumer as the room rate, and $18.00 would be described as "taxes and fees." The hotel subsequently would invoice the OTC for $190.75, which is the discounted rate of $175.00, to which is added $15.75 as the tax on that amount. The OTC would pay the invoiced sum,[3] and the hotel would remit the taxes. Thus, in this example, the consumer's choice between reserving a room through the hotel's website and through the OTC's website would result in a difference of $2.25 in the amount of hotel occupancy taxes that would be remitted to Houston.

**B.     The Lawsuit**

Houston sued the OTCs to collect taxes allegedly due on the difference between the amount consumers paid to OTCs and the amount OTCs paid to hotels. In addition, it alleged that the OTCs conspired to evade hotel occupancy taxes and converted taxes that

---

[3] If for any reason the hotel does not invoice the OTC for a particular room reservation—a situation the parties refer to as "breakage"—then the OTC is not contractually obligated to pay the hotel.

they actually collected. Houston sought an accounting, the imposition of a constructive trust, damages, penalties, attorneys' fees, costs, and interest.

The OTCs moved for traditional summary judgment on the grounds that (a) both the ordinance and the resolution tax only those amounts paid to hotels, and Houston either admitted that such amounts had been paid or had no evidence that taxes on those amounts had not been remitted; (b) OTCs provide nontaxable personal services; and (c) there is no evidence that they use or possess the hotel rooms.

As to Houston's conversion claim, the OTCs moved for traditional summary judgment on the ground that, as a matter of law, the money allegedly due to Houston cannot be the subject of such a claim. They also asserted there is no evidence that (a) Houston is entitled to possess the disputed funds, (b) the OTCs exercised unlawful and unauthorized control over such funds, and (c) Houston demanded the money. The OTCs further sought traditional summary judgment on the conspiracy claim, arguing that in the absence of a valid conversion claim, there is no underlying tort.

Regarding Houston's request that the trial court impose a constructive trust, the OTCs argued in their summary-judgment motion that a constructive trust is not a separate cause of action but instead is an equitable remedy to which Houston is not entitled. Finally, the OTCs asserted that Houston has no evidence that an accounting is necessary inasmuch as the City is statutorily authorized to audit the OTCs, and in any event, Houston's experts already had calculated the taxes allegedly due.

The trial court granted summary judgment on unspecified grounds and denied Houston's motion for new trial. On appeal, Houston raises two issues, arguing, first, that the local hotel occupancy taxes apply to the full amount paid by the OTCs' customers, and second, that genuine issues of material fact preclude summary judgment.

## II. STANDARD OF REVIEW

6

We review summary judgments de novo. *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 644 (Tex. 2009) (per curiam) (citing *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007)). We consider the summary-judgment record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the movant. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We must affirm the summary judgment if any of the movant's theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

The movant for traditional summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). A defendant who moves for traditional summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010). Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller*, 168 S.W.3d at 816. Once the defendant establishes its right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

In a no-evidence motion for summary judgment, the movant represents that there is no evidence of one or more essential elements of the claims for which the nonmovant bears the burden of proof at trial. TEX. R. CIV. P. 166a(i); *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The burden then shifts to the nonmovant to present evidence raising a genuine issue of material fact as to the elements specified in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). We sustain a no-evidence summary judgment when (a) there is a complete absence of evidence of a vital fact, (b) the

court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810. The evidence is insufficient if "it is 'so weak as to do no more than create a mere surmise or suspicion'" that the challenged fact exists. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009) (quoting *Kroger Tex. L.P. v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006)).

### III. GOVERNING LAW

The same rules that govern statutory construction apply to the construction of municipal ordinances. *Mills v. Brown*, 159 Tex. 110, 114, 316 S.W.2d 720, 723 (1958). Our primary objective is to give effect to the enacting body's intent. *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). The most reliable expression of such intent is the literal text of the provision. *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006). We presume that a statute's language was selected with care and that every word and phrase was used for a purpose. *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). Where possible, we avoid treating any statutory language as surplusage. *Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000). We construe a statute "according to what it says, not according to what we think it should have said." *City of San Antonio v. Hartman*, 201 S.W.3d 667, 673 (Tex. 2006). If a statute assigns a particular meaning to a term, courts are bound by the statutory usage. *TGS-NOPEC*, 340 S.W.3d at 439.

On the other hand, a statute that is susceptible to more than one reasonable interpretation is ambiguous. *See In re Hourani*, 20 S.W.3d 819, 825 (Tex. App.—Houston [14th Dist.] 2000, orig. proceeding). A taxing provision is construed strictly against the taxing authority and liberally in favor of the entity that the authority seeks to hold liable; thus, any ambiguity in the statute must be resolved in favor of the taxpayer. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 & n.23 (Tex. 2008);

8

*Bullock v. Statistical Tabulating Corp.*, 549 S.W.2d 166, 169 (Tex. 1977); *Wilson Commc'ns, Inc. v. Calvert*, 450 S.W.2d 842 (Tex. 1970).

## IV.  ANALYSIS

In their respective taxing provisions, both the City and the Sports Authority impose taxes on the "cost of occupancy."   They argue that the "cost of occupancy" is the amount that a consumer pays the OTC for a reservation.   The OTCs maintain that under the plain meaning of each provision, the "cost of occupancy" is the discounted rate paid to the hotel for the right to use a room.   In the alternative, the OTCs argued—and Houston agreed—that if the ordinance and the resolution are ambiguous, then the provisions must be construed against the taxing entities.  *See Bullock*, 549 S.W.2d at 169.   Thus, the OTCs in effect asserted that they were entitled to summary judgment because the taxing provisions at issue could be plainly or reasonably read to tax only the amount paid to hotels.

On appeal, Houston contends that the OTCs' "plain meaning" interpretation of the tax provisions is unreasonable.   Houston argues that if the ordinance is read in accordance with its plain meaning, it produces an absurd result.   As to the resolution, Houston asserts that the OTCs' "plain meaning" interpretation does not follow the text, but instead implies terms that the resolution does not contain.   We agree with the OTCs: at a minimum, a tax on the "cost of occupancy" reasonably can be read to apply only to the amount paid to the hotels.

In identifying the "cost of occupancy," both the City in its ordinance and the Sports Authority in its resolution define *occupancy* as "the use or possession, or the right to the use or possession, of any room in a hotel if the room is one ordinarily used for sleeping and if the occupant's use, possession, or right to use or possession extends for a period of less than 30 days."[4]   When a consumer reserves a room directly from the hotel, identifying the

---

[4]  *See* HOUS., TEX., CODE OF ORDINANCES § 44-101, *available at* http://library.municode.com/HTML/10123/level3/COOR_CH44TA_ARTIIIHOOCTA.html#COOR_CH4

"cost of occupancy" is straightforward.   The hotel furnishes the hotel room and determines the price it is willing to accept in exchange for the right to occupy a room; the consumer determines the price he is willing to pay for that right.   If it is agreed that the hotel will receive the specified price and the consumer will pay that amount, then the hotel sells, and the consumer buys, the right to use or possess the room.   In this scenario, the cost of occupancy is that single agreed amount.

When a hotel reservation is made through an OTC, however, two payments are involved.   The hotel still determines the amount it will charge for the right to occupy an available room, and the consumer still determines the amount he is willing to pay for that right.   But, the two figures are not the same.   To determine which of these two figures is the "cost of occupancy" that is subject to the taxes at issue in this case, we must begin with the words of each of the taxing provisions as the surest indicator of the enacting body's intent.   *See Alex Sheshunoff Mgmt. Servs.*, 209 S.W.3d at 651.

Although both the City and the Sports Authority defined the word *occupancy*, neither used the word *cost* as a defined term.   We therefore consider the plain and common meaning of the word.   *See Harris County Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009).   An examination of the ordinary usage of the word affords no clear guidance because *cost* can refer to the amount charged or the amount paid, and may or may not include profit.   *See* WEBSTER'S NEW WORLD COLLEGE DICTIONARY 314 (Victoria Neufeldt et al. eds., 3d ed. 1996) (defining *cost* as, *inter alia*, "to be priced at"; "the amount of money, etc. asked or paid for a thing; price"; "the amount paid for something by a dealer, contractor, etc.: a markup is usually added to arrive at a selling price *[*stoves sold at *cost* in a sale*]*").   To identify the word's intended meaning, we must consider the enactment as a whole.   *See Phillips v. Bramlett*, 288 S.W.3d 876, 880 (Tex.

4TA ARTIIIHOOCTA S44-101DE; Harris County-Houston Sports Authority, Tex., Resolution No. 97-21, § 2 (Sept. 10, 1997).   The definitions in the ordinance and the resolution differ only in punctuation and capitalization.   We have standardized both throughout this opinion.

2009).   And because there are differences in the language of the two taxing provisions, we examine them separately.

**A.      The Ordinance**

The taxing provision of the ordinance provides as follows:

> There is hereby levied within the corporate limits of the city a tax upon the cost of occupancy of any room furnished by any hotel where such cost of occupancy is at the rate of $2.00 or more per day, such tax to be equal to seven percent of the consideration paid by the occupant of such room to such hotel.

HOUS., TEX., CODE OF ORDINANCES § 44-102 (1991), *available at* http://library.municode.com/HTML/10123/level3/COOR_CH44TA_ARTIIIHOOCTA.html#COOR_CH44TA_ARTIIIHOOCTA_S44-102TALEAM.   Under the plain meaning of this provision, the *cost of occupancy* is that amount for which three conditions are satisfied.

First, the consideration at issue must have been paid or charged for the use or possession, or the right to use or possess, a hotel room ordinarily used for sleeping.   This is because the tax is imposed on the *cost of occupancy*, and *occupancy* is defined in this way in the ordinance.   When a statute assigns a particular meaning to a term, courts are bound by the statutory usage.   *See TGS-NOPEC*, 340 S.W.3d at 439.

Second, the amount to be taxed must have been paid "by the occupant of such room."   As commonly understood, the word *by* in the phrase *by the occupant* includes meanings such as "through the means, work, or operations of" and "in behalf of."   *See* WEBSTER'S NEW WORLD COLLEGE DICTIONARY 192.   *Occupant* is defined in the ordinance as "anyone, who, for a consideration uses, possess, or has a right to use or possess any room in a hotel if the room is one ordinarily used for sleeping."   *See* HOUS., TEX., CODE OF ORDINANCES § 44-101, *available at* http://library.municode.com/HTML/10123/level3/COOR_CH44TA_ARTIIIHOOCTA.html#COOR_CH44TA_ARTIIIHOOCTA_S44-101DE.   And *such* in the phrase *of such*

11

*room* indicates that the room for which consideration is paid on the occupant's behalf is the same room identified earlier in this provision as a room furnished by any hotel. *See Lechuga v. Tex. Employers' Ins. Ass'n*, 791 S.W.2d 182, 185 (Tex. App.—Amarillo 1990, writ denied) (explaining that the legislature's use of the words "such notice" in a statute demonstrated the legislature's intent to restrict the meaning of the word *notice* to refer to the same notice identified earlier in the statute).[5]

Third, the amount to be taxed must have been paid "to such hotel." The commonly understood meaning of the word *hotel* is "a commercial establishment providing lodging and, usually, meals and other services for the public, especially for travelers." *See* WEBSTER'S NEW WORLD COLLEGE DICTIONARY 653. The use of the word *such* in the reference to consideration paid *to such hotel* indicates that the consideration is that which is paid to the same hotel that furnished the room. *See Lechuga*, 791 S.W.2d at 185.[6]

Putting these requirements together, one can reasonably interpret the ordinance as imposing a tax on the amount paid to the hotel on the occupant's behalf for the right to use

[5] Houston suggests that reading this provision literally would lead to an absurd result in that the tax would apply only when the hotel received payment directly from the occupant. In enacting the ordinance, the City could not have used the word *by* to mean only "directly from." Such use of the word *by* would be inconsistent with the City's stated intent to tax the cost of *occupancy* in that it would allow *occupancy* to be purchased free of all local hotel occupancy taxes simply by routing payment through a third party.

[6] Houston asserts that the ordinance cannot be read literally because *hotel* is defined in the ordinance as "a building . . . in which the public may, for a consideration, obtain sleeping accommodations." According to Houston, if the ordinance is read in accordance with its plain meaning, then no taxes could be collected, because no one pays a building. In making this argument, Houston has ignored the City's express statement in the ordinance that defined terms would "have the meanings ascribed to them . . . except where the context clearly indicates a different meaning." The context clearly indicates that the enacting body did not intend the word *hotel* in section 44-102 to refer to a building, but instead used *hotel* in the sense we have described here, and as it commonly is used by courts, legislatures, the general public, and even the City and the Sports Authority. *See, e.g.*, *United States v. California*, 447 U.S.1, 4, 100 S. Ct. 1994, 1997, 64 L. Ed. 2d 681 (1980) ("One pier is privately owned by a hotel . . . ."); *W. Union Tel. Co. v. Shaw,* 142 Tex. 243, 245, 177 S.W.2d 52, 53 (1944) ("The message . . . was delivered by the hotel to the Western Union office . . . ."); TEX. TRANSP. CODE ANN. § 643.002(4) (West 2011) (providing that a "vehicle operated by a hotel" is exempt from motor-carrier registration requirements); MERRIAM WEBSTER'S COLLEGIATE THESAURUS, 374 (1988) (identifying the "meaning core" of the word *hotel* as "an establishment for the lodging and entertainment especially of transients"); Appellants' Br. at 7 (stating that OTCs usually do not disclose the "rate [they] pay the hotels").

a room ordinarily used for sleeping. An OTC's payment of the discounted rate to the hotel meets these three conditions; the consumer's payment to the OTC does not.

This is a reasonable reading of the ordinance, as can be seen by comparing the products or services of hotels and OTCs to the defined term *occupancy*. Simply stated, a hotel has rooms and the concomitant right to use or possess those rooms; to express this right in the terms defined in the resolution, a hotel has *occupancy*. The hotel offers *occupancy* in exchange for payment of the invoiced discounted rate. An OTC, on the other hand, does not have rooms or *occupancy*; as Houston concedes, the OTCs do not have the right to use or possess hotel rooms. Instead, the OTCs have websites and provide information. The content of a given OTC's website includes material provided by the hotel, which may include photographs, descriptions, and listings of the amenities and services available onsite—but the OTC also provides information about the hotel's competitors. Visitors to the website can access maps, check room availability, and compare rates, ratings, and the reviews of other consumers. In many instances, visitors to an OTC's website have the additional opportunity to combine the OTC's services in booking a hotel room with its similar services in arranging cruises, flights, and ground transportation. In sum, the OTC does not merely help the website visitor make a reservation; it also helps consumers make informed choices in spending their travel dollars, and to do so conveniently and efficiently. When the consumer pays the OTC, the payment includes compensation for these benefits.

We do not consider whether Houston's interpretation is also reasonable.[7] If Houston's interpretation of the ordinance is also reasonable, then the ordinance is ambiguous and the trial court could have properly granted summary judgment on the ground that the ordinance is ambiguous and therefore must be strictly construed against Houston and in the OTCs' favor. *See Bullock*, 549 S.W.2d at 169. If Houston's

---

[7] *See* TEX. R. APP. P. 47.1 (appellate court's opinion must be as brief as practicable while addressing every issue raised and necessary to final disposition of the appeal).

13

interpretation is not reasonable, then the ordinance has only one meaning, is unambiguous and summary judgment in favor of the OTC is correct. We conclude that, for the purposes of the City's ordinance and as applied to these facts, the phrase *cost of occupancy* means the discounted rate paid by the OTC to the hotel.[8] Because Houston produced no evidence that local hotel occupancy taxes on this amount were not remitted, we overrule Houston's first issue as it applies to the City.

## B.    The Resolution

The Sports Authority similarly imposes a tax on the "cost of occupancy." Houston argues that the *cost of occupancy*, as that expression is used in the resolution, is the marked-up rate that consumers pay to OTCs, and the OTCs argue that this phrase refers to the discounted rate the OTCs pay hotels.

To identify the payment that the Authority intended to tax, we begin with the text of the resolution. The key provision of the resolution is as follows:

> There is hereby imposed a tax on the cost of occupancy of any sleeping room in a Hotel in the Authority for which the cost of occupancy is at the rate of $2.00 or more per day, and such tax shall be an amount equal to 2% of the price paid for the occupancy of a sleeping room in the hotel, except that no tax shall be imposed on the cost of a room occupied as follows: (i) by a person with the right to use or possess the room for at least thirty consecutive days without interruption of payment during such period; and (ii) by governmental entities or officers and employees of a governmental entity when traveling on or otherwise engaged in the course of official duties for the governmental entity.

Harris County-Houston Sports Authority, Tex., Resolution No. 97-21, § 3 (Sept. 10, 1997) (capitalization standardized).

Under the terms of the resolution, the "cost of occupancy" is "the price paid for the occupancy of a sleeping room in the hotel." *Price* is not a defined term, and its commonly

---

[8] Consequently, the tax does not apply to breakage, because by definition, these are transactions in which the hotel ultimately was paid no consideration for the right to use or possess the room.

14

understood meanings include "the amount of money, etc. asked or paid for something; cost; charge" and "value or worth." WEBSTER'S NEW WORLD COLLEGE DICTIONARY 1068. Like the use of the word *cost*, the expression *price paid* does not signify whether the price at issue is the price paid to the OTC or the price paid to the hotel. Unlike the City, however, the Sports Authority did not include language in the resolution expressly stating by whom or to whom such "cost of occupancy" is paid. Nonetheless, we conclude that it is reasonable to construe the resolution as imposing a tax on the price paid to the hotel for the occupancy of a sleeping room in the hotel. As previously discussed, it is reasonable to read the phrase *cost of occupancy* to refer to the amount paid to hotels for the right to use a room, particularly when one considers the difference in the products and services offered by hotels and by OTC. Even if Houston's construction of the resolution were reasonable, this would only create an ambiguity that this court would have to resolve in favor of the OTCs. *See Bullock*, 549 S.W.2d at 169.[9] We therefore must construe the provision strictly against the taxing entity and liberally in favor of the entity that the authority seeks to hold liable. *See id.*

We conclude that, like the City's ordinance, the Sports Authority's resolution imposes a tax on the amount paid to the hotel, and not on the amount paid to the OTC.[10] We therefore overrule Houston's first issue as it applies to the Sports Authority.[11]

---

[9] Houston relies on opinions from the state comptroller interpreting the state hotel-occupancy statute. These are not persuasive for several reasons. First, the statute imposing state hotel-occupancy taxes does not use the expression *cost of occupancy* at all. *See* TEX. TAX CODE ANN. § 156.05 (West 2008). Second, the opinions apparently were based on different facts. As Houston stated in its brief, "The Comptroller's decisions were based on the OTCs' contractual rights to control occupancy of the hotels' room inventory at discounted prices . . . and establish their own cancellation policies." Houston has cited no such evidence in this case, and as we explain in connection with Houston's conversion claim, control is not an issue here. *See infra* at n.12. Third, and notwithstanding the opinions that Houston cites, Houston has never argued or cited evidence that the state in fact collects hotel-occupancy taxes based on the amounts that consumers pay OTCs. And fourth, we are concerned with the intent of the Sports Authority when it drafted the resolution in 1997; it could not have relied on the opinions that Houston cites, because these did not exist at that time.

[10] The tax accordingly does not apply to "breakage."

[11] In support of their respective positions, the parties have cited the rulings of trial courts and

15

## C.    Absence of Issues of Material Fact

In its second issue, Houston contends that material fact issues preclude summary judgment.   We disagree.

As for Houston's tax claim, we have concluded that the local hotel occupancy taxes apply only to the amount paid to the hotels, and because Houston produced no evidence

---

administrative hearing officers; the official and unofficial advice and opinions of government agencies, officials, and employees; and the decisions of various state and federal appellate courts.   We have not found this material persuasive.   We can construe only the provisions before us, and the language of the ordinance and the resolution differ from that of most of the cases cited by the parties.   *See, e.g.*, *Louisville/Jefferson Cnty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 383 (6th Cir. 2009) (holding that under Kentucky law, OTC was not subject to a transient room tax on the room rent charged by "organizations doing business as motor courts, motels, hotels, inns or like or similar accommodations businesses"); *Pitt Cnty. v. Hotels.com, L.P.*, 553 F.3d 308, 311–14 (4th Cir. 2009) (holding that under North Carolina law, payments to OTCs did not fall within scope of tax imposed on "gross receipts" of "[o]perators of hotels, motels, tourists, homes, tourist camps, and similar type businesses"); *City of Findlay v. Hotels.com, L.P.*, 441 F. Supp. 2d 855, 858–59, 861 (N.D. Ohio 2006) (holding that city failed to allege that OTCs are "vendors" required to collect transient guest tax, but adequately alleged that OTCs collected amounts denominated as "sales tax" or "bed tax"); *Travelscape, LLC v. S.C. Dep't of Revenue*, 391 S.C. 89, 101, 705 S.E.2d 28, 34 (2011) (stating that OTCs do not "furnish" accommodations because they do not physically provide them, but they are "engaged . . . in the business of" furnishing accommodations as the word "business" is defined by South Carolina statute).

Two cases filed in Texas federal courts involve provisions similar to those at issue here, but there are other reasons that these have not influenced our analysis.   In *City of Orange, Texas v. Hotels.com, L.P.*, No. 1:06-CV-413, 2007 WL 2787985 (E.D. Tex. Sept. 21, 2007) the court held that a statute similar to the City's ordinance in this case unambiguously taxed only amounts paid to "hotels"; that the word *hotels* was defined in the ordinance as "buildings in which a member or members of the public may, for consideration, obtain sleeping accommodations"; and thus, amounts paid to the defendant OTCs were not subject to the tax because OTCs are not buildings.   The court further held that this was not an absurd result, apparently failing to recognize that what is true of an OTC—that it is not a building—is equally true of every person or business organization in the hotel industry.   If only payments to buildings were taxed, then there would be no tax at all.

The remaining Texas case is a class action that is still pending.   *See City of San Antonio, Tex. v. Hotels.com*, Civil No. SA-06-381-OG, in the Western District of Texas, San Antonio Division.   Although Houston opted out of the class action and there is no final judgment, Houston has asked us to consider the findings of fact and conclusions of law that were signed on July 1, 2011, eighteen months after the trial court granted summary judgment in this case.   We are reluctant to discuss a pending case in detail, and there is no need for us to do so.   Because we have considered the arguments and evidence presented in this case, it follows that we have considered the arguments and evidence presented in the class action to the extent that they overlap with those presented here.   We cannot consider arguments and evidence of the class action that differ from those presented to the trial court in this case.   *See* TEX. R. CIV. P. 166a(c), (i).

16

that such sums were not paid, the trial court did not err in granting the OTCs summary judgment on that cause of action.[12]

Houston also asserted a cause of action for conversion, and asked the trial court to impose a constructive trust.[13] The OTCs moved for summary judgment on Houston's conversion claim on both traditional and no-evidence grounds. We therefore address the no-evidence grounds first, because it is unnecessary to determine if the defendants' evidence would eliminate all questions of material fact if the plaintiff fails to produce evidence sufficient to raise any question of material fact in the first place. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). The OTCs asserted that Houston had no evidence that, *inter alia* (a) it was entitled to possession of the disputed funds, (b) the OTCs exercised unlawful and unauthorized control over such funds, and (c) Houston demanded such funds. *See Hunt v. Baldwin*, 68 S.W.3d 117, 131 ((Tex. App.—Houston [14th Dist.] 2001, no pet.) (citing *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447

---

[12] In connection with both its tax and conversion claims, Houston argued on appeal that it "presented uncontested evidence that the OTCs control the hotels, which the trial court was required to assume as a fact." More specifically, Houston asserts that the OTCs control hotels "for purposes of their merchant hotel transactions," or "with regard to the functions of advertising, pricing rooms, making reservations," or "for the purposes of collecting and remitting occupancy taxes." Such control is not an issue. Both the ordinance and the resolution contain provisions requiring one who controls a hotel to collect and remit the taxes, but nothing in these collection provisions purports to change what is taxed. The tax applies to the cost of occupancy paid to the hotel, and an OTC is not a hotel, either as that term is commonly understood or as more narrowly defined in those parts of the taxing provisions that define *hotel* as a physical building. *See In re Lumsden*, 291 S.W.3d 456, 460 (Tex. App.—Houston [14th Dist.] 2009, orig. proceeding) ("'When a statute uses a term with a particular meaning, we are bound by the statutory usage.'" (quoting *Lewis v. Funderburk*, 253 S.W.3d 204, 207 (Tex. 2008))); *Sorokolit v. Rhodes*, 889 S.W.2d 239, 241 ("[C]ourts may not by implication enlarge the meaning of any word in the statute beyond its ordinary meaning; such implication is inappropriate when legislative intent may be gathered from a reasonable interpretation of the statute as it is written."). Moreover, the cited material does not merely lack probative value; it has no legal existence under Texas law. The "facts" that Houston cites are in reality the factual findings and legal conclusions of an administrative hearing officer in Anaheim, California concerning different issues, evidence, and law, and contained in a decision that was reversed and set aside before this appeal began—a fact not disclosed by Houston. We therefore point out that under Texas law, setting aside a decision "completely nullifies it, leaving it as if it had never been rendered other than as to further rights of appeal." *Flowers v. Flowers*, 589 S.W.2d 746, 748 (Tex. Civ. App.—Dallas 1979, no writ).

[13] On appeal, Houston does not challenge the judgment as it applies to Houston's conspiracy claim or its request for an accounting.

(Tex. 1971)). Houston did not respond to this portion of the OTCs' motion, and because the disputed funds were not subject to the local hotel occupancy taxes, Houston was not entitled to possess them; hence, the OTCs' control of the funds was not unlawful. We therefore affirm the summary judgment as to Houston's conversion claim. *See* TEX. R. CIV. P. 166a(i). Regarding Houston's request that the trial court impose a constructive trust, the OTCs correctly pointed out in their summary-judgment motion that a constructive trust is not a separate cause of action but instead is an equitable remedy. *See Newman v. Link*, 866 S.W.2d 721, 725 (Tex. App.—Houston [14th Dist.] 1993), *writ denied*, 889 S.W.2d 288 (Tex. 1994) (per curiam). Because Houston cannot prevail on any of its causes of action, it is not entitled to such a remedy. We accordingly overrule Houston's second issue.

## V.  CONCLUSION

This court must construe ambiguous tax statutes strictly against the taxing authority and liberally in favor of the entities sought to be taxed. Both the City of Houston's ordinance and the Sports Authority's resolution reasonably can be construed as imposing a tax on the price paid to the hotel for the occupancy of a sleeping room in the hotel. Therefore, even if the competing constructions were reasonable, this court would have to resolve the ambiguity in favor of the OTCs. We conclude that the trial court correctly construed the ordinance and the resolution. We therefore affirm the trial court's judgment.

/s/     Tracy Christopher
Justice

Panel consists of Chief Justice Hedges and Justices Frost and Christopher.

18